**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

                                    No. 19 CR 1439 WJ

    v.

TURAB LOOKMAN,

       Defendant.

**SENTENCING MEMORANDUM IN SUPPORT OF REQUEST FOR
PROBATED OR FINANCIAL SENTENCE AT THE LOW END OF THE
RECOMMENDED GUIDELINE SENTENCING RANGE**

The Defendant Turab Lookman, by and through his attorneys, Paul M. Linnenburger and

Marc M. Lowry of Rothstein Donatelli, LLP, pursuant to U.S. Const. amend. V; U.S. Const.

amend. VI; U.S. Const. amend. VIII; U.S. Const. amend. XIV; 18 U.S.C. §3552; 18 U.S.C. §3553;

18 U.S.C. §3661; and Fed. R. Crim. Pr. 32, hereby submits this Sentencing Memorandum in

Support of His Request for Probated or Financial Sentence at the Low End of the Recommended

Guideline Sentencing Range and states as follows:

**I.**      **Introduction**

      A.     <u>Sentencing History</u>

Historically, federal sentencing was a highly individualized and personal process that

necessarily considered *both* the act *and* the actor. "It has been uniform and constant in the federal

judicial tradition for the sentencing judge to consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate, sometimes magnify,

the crime and the punishment to ensue. Underlying this tradition is the principle that the

punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct.

1229, 1239 (2011) (citations omitted). The historical approach recognized that "[i]t is not a valid

objective of the criminal law to give the same sentence to two persons who have committed the same crime, irrespective of important differences between them…a substantial distinction is fully warranted and required if the system is to do justice." *United States v. Rodriguez*, 724 F.Supp. 1118, 1122 (S.D.N.Y.1989).

Following *United States v. Booker*, 543 U.S. 220 (2005), the courts' historical ability to give full and appropriate consideration to both the act and the actor came back into focus. Once again, courts are obligated to fashion an individualized sentence – one that is no more severe than necessary to achieve the statutory purposes of punishment as described in 18 U.S.C. §3553(a). *United States v. Conlon*, 500 F.3d 1167, 1169 (10th Cir. 2007). An analysis of this case leads to the conclusion that a sentence at the low end of the applicable Guideline sentencing range – a probated or financial sentence – is reasonable and no greater than necessary to achieve the statutory purposes of sentencing, namely punishment, deterrence and justice.

B.     Statutory Factors Support Low-End Probated or Financial Sentence

The "parsimony provision" contained in §3553(a) sets a cap for an appropriate sentence - the minimum level necessary to achieve the statutory purposes of sentencing. Factors to be considered in determining the sentence necessary to achieve these purposes include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, promote respect for the law, provide *just* punishment, afford adequate deterrence, protect the public, and provide the most effective correctional treatment. The defense submits an examination of these factors applied to Dr. Lookman's circumstances and characteristics and provides ample support for a sentence at the low end of the recommended Guidelines range, one that is probated or financial. Accordingly, such a sentence is not only warranted, it is mandated by the legislative commands of 18 U.S.C. §3553(a).

That is not to say that this is not a serious matter. The defense understands and acknowledges the important considerations behind the criminalization of the activity for which Dr. Lookman was charged and pled guilty, and in no way intends to minimize the same. However, as shown herein, those considerations, evaluated in the context of the goals of sentencing, are addressed by a sentence at the low end of the applicable Guidelines range in this case. In particular, a low-end sentence is appropriate when one views Dr. Lookman's history and characteristics, including his life-long encouragement and service to others and scientific advancement, his history of high character and good works that left a global and generational trail of beneficiaries. At the same time, Lookman's post-offense rehabilitative efforts and growth, lack of criminal history, and severely low likelihood of recidivism show that a low-end sentence will provide adequate protection to the public, just punishment and promote respect for the law.

The defense thus requests this Court follow the Guidelines and issue a low-end probated or financial sentence in accordance therewith.

## II. Application of Statutory Sentencing Factors

A consideration of the statutory factors and the purposes of punishment mitigates in favor of a probated or financial low-end sentence in this case.

### A. History and Characteristics of Turab Lookman – Dr. Lookman's Remarkable Story Shows His True Nature is a Man of Depth, Compassion and Caring

One cannot appreciate the depth of remorse and punishing loss felt by Turab Lookman as a result of what led him to sentencing before this Court without an understanding of his incredible life journey, the lessons it taught him, and the ways in which he implemented those. Dr. Turab Lookman, now almost 70 years of age, is a devoted father and mentor. Through a lifetime of trials, growth, hard work, determination and giving he developed positive characteristics atypical of individuals before this Court for sentencing. His life before and after the events which led to this

sentencing exemplify his true character, the goodness of which has stretched across generations and the globe.

1. *Dr. Lookman's extraordinary global journey to New Mexico*

    a. *Turab's early life and lessons shape his goodness*

Turab Lookman was born in 1952 in India, shortly after the end of British colonial rule. His earliest years were spent in the family home of his grandmother, aunts and uncles while his father toiled in Kuwait to support the family. From his grandparents, who started a school for orphans in the neighborhood, he learned the importance of community and learning – lessons he would carry with him across the globe. Although his immediate family was not college educated, the extended family included his Aunt Hamida, who tutored him in math when he struggled early in the subject. Through her, he learned the value of hard work and the importance of sharing knowledge and encouragement openly with the next generation. (As his daughter notes, to this day he believes "knowledge is open and for everyone to share.")

Young Turab stayed with his grandmother, whom he affectionately calls "Maaji", as his parents became nearly full-time residents of Kuwait for several years. In those years, as family and friends cycled through the family home, Turab learned the importance of familial bonds and community. At fourteen, he left Bombay to join his parents full time in the Middle East, never to see his grandmother again, a loss that hurts still. But he carried with him her compassion, empathy, love of learning, and general goodness of spirit.

After several months in Kuwait, Turab and his parents piled into a sedan, and began a month-long overland trek to the United Kingdom. They began their lives there in a one-room hotel until settling in a small home while Turab's father returned to the Middle East. His love of family and community solidified further as his mother used their modest home as a gathering place for

extended family and community. Through many hours spent helping his mother serve and care for others, Turab's inner kindness and generosity began to outwardly shine. These traits were on full display when, as a young man, he took a night shift on an assembly line to help provide for the family and the following summer toiled away in a coat factory to save enough money to provide his mother with overcoats she would cherish for decades.

In England, the love of learning, passed to Turab from his aunt, truly flourished, accompanied by the lessons of hard work his father had instilled. As he pursued his studies, his family began to move on. While they stayed connected, Turab was largely alone. One holiday season in particular, the dorms closed down and Turab had nowhere to turn. His holiday was spent alone, in a train depot, but overjoyed by an occasional home-cooked meal from the family of friends. This experience stuck with him, and he vowed to return the generosity by passing it forward to others far from family and home.

b.    *Dr. Lookman implements that goodness*

After earning a doctoral degree, Dr. Lookman followed his brother to Canada, carrying with him the lessons of sharing, generosity, kindness and humility instilled in him from birth. Now in North America, he began a career that would leave a global footprint and a trail of goodness stretching generations.

After a brief return stint in London, Turab returned to Canada, where he settled at the University of Western Ontario. His innate desire to share knowledge and unique ability to encourage and promote the best in others was immediately apparent. His first graduate student, Dongming Zhao, learned this firsthand. Dongming, far from home and alone was distraught at the delay in his wife's joining him in North America. Turab, remembering the pain of loneliness he felt while studying far from home, took it upon himself to facilitate the immediate processing of

Dongming's wife's application for a visa to Canada. Dongming Zhao, forever grateful for that personal act of kindness, like so many of Dr. Lookman's students, became a lifelong friend.

He came to Los Alamos on sabbatical from the University in the early 1990's, a time that planted within him a deeper love of scientific collaboration and the community it inspired. He yearned for a full-time placement at Los Alamos, and in the late 1990's, when one was offered, he jumped at the opportunity. For twenty years he relished in the opportunities to share scientific advancement with the best minds in the world at LANL, earning many awards and distinctions.

Turab Lookman's lifetime was a journey that took him from post-colonial India, to the Middle East, to the United Kingdom, to Canada, and eventually his dream in Los Alamos. As his wife recognizes, that dream was intended to continue to the end as retirement was not a consideration. Afterall, an early mentee of his, Roman Groger, recalls, Dr. Lookman looked no further than LANL because "there was nothing more he could achieve and [he] wanted to be where the best science is done." Having reached his pinnacle, a perch that allowed him to collaborate with the brightest scientific minds and pass on a love of learning and science to new generations, Dr. Lookman would not consider giving it up. It pains him beyond words that his actions caused a premature end to that dream.

2. *Dr. Lookman's commitment to family*

The love of family he learned from his grandmother never left Dr. Lookman. In Canada, Dr. Lookman saw to it that his parents were close where he could care for them. His daughters noticed his dedication, as did the community. Friends and colleagues, Jackie and Bob Bell, came to admire "how good he was to his parents, keeping in close contact with them and introducing them to his friends." As they aged, Turab cared for them through physical and mental ailments, at their side until the end. He brought this same commitment to raising his daughters.

He will tell anyone that his greatest accomplishment is his family. Upon the birth of his first daughter, friends remember the way "[h]is face literally lit up when he spoke [his new daughter's] name." Two more daughters were added over the years, and Turab ensured each felt nothing but love, encouragement and support. His fondest memories remain singing Hindi songs to the girls and bicycling the neighborhood with them. To this day, he remains deeply imbedded in their lives, providing the support and guidance all children should receive from their fathers.

3. *Dr. Lookman's commitment to fostering growth – an extraordinary goodness of character and commitment to service has not been lost*

Over the years, Dr. Lookman has exhibited a strength of character and commitment to community and service that will serve him well on his rehabilitative journey. In the world of science and research, it is easy for egos to become supersized and for established scientists to take advantage of the next generation. This was not the experience of Turab Lookman, who rose to global recognition, but never lost humility, love of his community, or commitment to serve and provide opportunities to coming generations.

As the numerous letters in support of Dr. Lookman show, he has shown a deep and abiding commitment to his colleagues and community. Colleagues like James Gubernatis remember the "considerable time" he spent with younger scientists, making sure they had opportunities to co-author to "help them get their careers off to a faster start." As Panagiotis Maniadis relayed in his letter to the Court, Dr. Lookman's "door was always open" and he was willing to put in the time to do whatever it took to train and develop scientists, not just in their field, but as human beings.

Remembering the pain of loneliness far from home and alone without a roof over his head for the holidays, Dr. Lookman's extended his home and heart, opening a world of "warmth, generosity, and inclusiveness" to many far from home. Even on his first short time in Los Alamos, he included others, like John Eklund, in his own family's holiday. His daughters recount for the

Court that Turab always opened his home to "students for dinners, holidays, and weekend work sessions," and providing "a meal and company" to help stave off the loneliness that often accompanies pursuit of knowledge. And like a young Turab, his daughters learned "the importance of giving back and helping others in need."

When others faced personal hardship, he provided comfort and stability, whether it be a student like Roman Groger, or colleagues faced with evacuation from fire. Over decades, Dr. Lookman "has helped a lot of his students/postdocs/colleagues to succeed in their careers," and he has done it due to an innate desire to be "engaged and interested in everything and everyone around him." Colleagues still remember fondly "[h]is respect for colleagues of any nationality, willingness to help, selfless character, and caring family relations."

It is this unique history, of a mentor not only in science, but in life, of a man full of kindness, caring and generosity, that led to his receipt of the LANL Postdoctoral Distinguished Mentor Award – the proudest of his accomplishments outside his own girls. Turab spent a career showing others he was, in fact, concerned for them and that they had his unwavering support and commitment. Put simply, New Mexico, LANL, the scientific community and every organization of which Turab was a part was better because of his involvement. As set forth in the letter to the Court from Zhen Liu, currently in Germany, this goodness has extended beyond LANL, beyond New Mexico, and beyond the continent, while being passed down to further generations through those implementing his example.

4.  *Turab Lookman's commitment to others remains a feature of his character*

As a result of the events of this case, Dr. Lookman no longer has the opportunity to provide the support and guidance he cherished so much at LANL, he has found other outlets for his generosity. Limited by stringent conditions of release, Turab's generosity, encouragement and

support are seen by his family and community. Through a recent career change, he is his daughter's biggest supporter, extending his knack for encouragement to those in her fitness studio. He volunteers at shelters, assists with projects around the church, and has re-devoted himself to personal growth and development while maintaining highly personal acts of generosity.

This giving individual, unselfish with his time and talents, is the man that Turab Lookman has been for the vast majority of his nearly seven decades, not the aberrational mistakes which brought him before this Court. And it is this to which Dr. Lookman has returned and will remain. Dr. Lookman is unique amongst individuals appearing before this Court for sentencing as his life is otherwise a testament to the best of humanity.

B.    The Nature of the Offense

1.    *Counsel's Investigation Highlights that Dr. Lookman is Not a Danger to the United States or the Community*

Dr. Lookman entered a plea of guilty to a violation of 18 U.S.C. §1001(a)(2). Dr. Lookman recognizes and appreciates the seriousness of these matters and the importance of complete transparency and honesty in disclosure of foreign contacts for those associated with LANL. While defense counsel does not intend to suggest otherwise, counsel is obligated to share with the Court results of the defense investigation, which, contrary to early argument made by the Government in this case, highlights that this is not an instance of international espionage or sabotage, and that Dr. Lookman is not a danger to the United States or his community.

Counsel notes that, while Dr. Lookman had clearance, his work was "outside the fence" and publicly available (often through publication). Discovery showed LANL was aware Dr. Lookman had connections to scientists (many with their own LANL history) across the globe and was collaborating on projects in several places. Regardless of the events that led to this sentencing, it is apparent that Dr. Lookman did not hide that he was a scientist focused intently on the

advancement of science and collaboration with minds wherever they were found. He deeply regrets the lack of transparency in this case, but counsel cannot fathom that Dr. Lookman would be seen as a danger to the United States.

In this regard, it is important for the Court to be aware that the information raised in objections to the offense conduct came from defense counsel's independent review and investigation. Counsel had contact with key witnesses overseas, including in China, and through those contacts counsel obtained, independently, information and documents that suggest Dr. Lookman's affiliation was to be an unpaid fellowship. Counsel acknowledges that compensation in other forms was contemplated, including funding for research.

Counsel acknowledges that the information from the defense investigation does not absolve Dr. Lookman and does not mean to suggest otherwise. Dr. Lookman has taken, and continues to take, responsibility for not disclosing the affiliation and counsel acknowledges the same. Counsel provides this information to underscore a simple point - Dr. Lookman was not, and is not, a danger.

2. *The Sentencing Commission Considered the Nature of the Offense and Recommends a Probated or Financial Sentence*

To further underscore the point, the nature of the offense suggests a low-end probated or financial sentence is appropriate. The nature of the offense was considered at length by the Sentencing Commission in formulating the Guidelines. An extreme amount of time, resources and effort went into the formulation of the Guidelines, and in this case they recommend a probated or financial sentence is appropriate.

C. Examination of Sentencing Factors Show a Sentence of Probation at the Low End of the Applicable Guideline Sentencing Range is Appropriate

Dr. Lookman has nearly 70 years of mitigatory evidence. His history suggests a sentence at a low end of the recommended Guideline sentence is the most appropriate.

1.  *The Absolute Aberrant Nature of the Offense – Dr. Lookman's Complete Lack of Criminal History or Substance Abuse Issues*

This Court should consider the entire life of Dr. Lookman, summarized above, in determining a sentence at the low end of the applicable Guideline sentencing range is appropriate. As a preliminary matter, it is apparent that this offense was an aberration as Dr. Lookman is almost 70 years of age, and rather than any hint of a criminal history, he has a documented lifetime of service and generosity.

a.  *Lack of criminal history*

"[T]he length of time a person refrains from the commission of crimes, which is invariably tied to a person's age, is a factor that is critical to a court's determination of the sentence it should impose." *United States v. Ward*, 814 F.Supp. 23, 24 (E.D.Va.1992). Courts have found that offenders with a prior criminal history are less culpable if they have not served lengthy prison terms prior to the instant offense. *See United States v. Collington*, 461 F.3d 805, 808 (6th Cir.2006); *United States v. Garrison*, 560 F.Supp.2d 83, 88 (D.Mass.2008); *United States v. Wilkerson*, 183 F.Supp.2d 373, 381 (D.Mass.2002); *United States v. DeJesus*, 75 F.Supp.2d 141, 144 (S.D.N.Y.1999). The mitigatory effect on culpability is heightened when an offender, like Turab Lookman, has absolutely no prior criminal history – no convictions, no arrests or even charges. *United States v. Howe*, 543 F.3d 128, 132-133 (3rd Cir.2008); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir.2009); *United States v. DiMattina*, 885 F.Supp.2d 572, 581-582 (E.D.N.Y.2012); *Ward*, 814 F.Supp. at 24.

b.  *Aberrant nature of offense*

Closely related is the completely aberrant nature of the conduct in this case. This is evident by examining Dr. Lookman's life, wherein "by all accounts, [Turab] led an honorable and lawful life until this point…. no prior criminal history, nor any history of substance abuse of any kind….

"[a] well-regarded member of [his] community…. [and a] devoted husband, father, and son." *See Howe*, 543 F.3d at 132. In the context of "his entire life" of nearly seventy years, "this series of events reasonably could constitute an isolated mistake." *Id.*, 543 F.3d at 133.

Courts recognize the aberrant nature of conduct as mitigatory even if it is not a single, spontaneous act, if it is "utterly inconsistent with [one's] character." *United States v. Jones*, 158 F.3d 492, 500 (10th Cir. 1998); *United States v. Garcia*, 182 F.3d 1165, 1176 (10th Cir.1999) (aberrant behavior departure looks to character of conduct as a whole, not number of acts); *United States v. Pena*, 930 F.2d 1486, 1495 (10th Cir.1991). In this case, a low-end probationary or financial sentence is appropriate because the offense was utterly inconsistent with Dr. Lookman's character as displayed by 99.9 percent of his life.

Contrary to the events of this case, Dr. Lookman's lifetime of conduct, "reflected long-term employment, economic support for [his] family, no abuse of controlled substances, and no prior involvement in [criminal activity]." *Pena*, 930 F.2d at 1495; *see also DiMattina*, 885 F.Supp.2d at 581-582 (typical conduct exemplified by graduation from high school, hard work and family support); *United States v. Wachowiak*, 412 F.Supp.2d 958, 962-963 (E.D.Wis.2006) ("where the defendant led an otherwise praiseworthy life, the court should consider a sentence below the advisory range").

c. *History of personal good works*

Turab Lookman's prior history was not only law-abiding, it involved a deeply personal involvement with his community through personal generosity, openness, giving and mentoring. His life has been full of good works directed towards family, friends, and community. Scientists worldwide recognize him as "a caring individual and role model to his family, friends, students, post-docs and many collaborators worldwide." He extended personal help whenever he could,

whether it be greasing the wheels for a spousal reunion of Dongming Zhao, comforting a colleague after a devastating miscarriage, extending invitations to holiday celebrations to those far from home, or offering after-hours free-of-charge tutoring to a neighbor.

Many charged with similar offenses appear before this Court touting charitable giving. Turab Lookman's generosity is much deeper and highlights just how out-of-character these events are. Unlike "the impersonal writing of checks that is the norm for many wealthy individuals", the personal acts of Turab's charity "are qualitatively different from the detached donation of money." *United States v. Cooper*, 394 F.3d 172, 177 (3rd Cir.2005). They show a strength of character and commitment to community that suggest a low-end sentence of probation is reasonable and appropriate.[1]

> 2. *Dr. Lookman's willingness and ability to rehabilitate show a low-end probated or financial sentence will promote the primary goal of sentencing*

The "central goal of sentencing" should be rehabilitation. *United States v. Rhodes*, 145 F.3d 1375, 1381 (C.A.D.C.1998). In this context, as noted by Rev. Talitha Arnold, Turab Lookman possesses a self-awareness and commitment to rebuilding his life and returning to a life of giving that is unique amongst individuals appearing before this Court for sentencing, Turab was a dedicated father and servant before this offense. As the many letters to this Court attest, he was a man of integrity, honesty, goodness, dependability, natural unselfishness, and caring. He is again that man, providing assistance to scientists even after his dismissal so that they may advance their careers, maintaining his position as a pillar of strength and love for his family, and, as noted by Rev. Arnold, committed to service and self-betterment.

---

[1] Under such circumstances, courts recognize that, even when offense conduct involves a number of discrete acts, culpability is mitigated when that conduct is an aberration from otherwise good character. *Howe*, 543 F.3d at 133; *Jones*, 158 F.3d at 500; *Garcia*, 182 F.3d at 1176; *Germosen*, 473 F.Supp.2d at 228.

He has learned greatly from this mistake and the immense loss it has cost him, and has proven that he will work hard to regain the trust of society and will fulfill the responsibilities of citizenship without the need for further incarceration. *See Jones*, 158 F.3d at 503 (approving of mitigation of sentence based in part on "scrupulously follow[ing] the conditions of release"); *United States v. Hairston*, 502 F.3d 378, 383 (6th Cir. 2007) (approving of post-offense rehabilitation as grounds for mitigating sentence); *United States v. Newlon*, 212 F.3d 423, 424 (8th Cir. 2000) (approving of post-offense rehabilitation as grounds for mitigating sentence); *United States v. Green*, 152 F.3d 1202, 1208 (9th Cir. 1998) (active engagement in rehabilitation appropriate consideration for mitigation); *United States v. Greer*, 375 F.Supp.2d 790, 793 (E.D. Wis.2005) (appropriate mitigating circumstance when defendant succeeds on pre-trial release); *United States v. Jaber*, 362 F.Supp.2d 365, 383 (D. Mass. 2005) (mitigation appropriate when perfect record on pretrial release).

Dr. Lookman's actions during the pendency of this case and response since being charged shows commitment that exhibits "a strength of character in confronting his problems" that reduces the chances of recidivism, *Wachowiak*, 412 F.Supp.2d at 963, and leads to the natural conclusion that Dr. Lookman is already, himself, meeting the primary goal of sentencing:

> …if we accept that good people can falter, rehabilitation can be achieved through a return to the good…. A person without a serious criminal history who has made a remarkable shift back to the person [he] was before criminality, or even beyond, should not be precluded from relief because [he] does not counsel HIV patients, tutor prisoners, or join the military – as in some of the cases requiring such acts as a basis for a finding of extraordinary rehabilitation…

*United States v. Hawkins*, 380 F.Supp.2d 143, 160 (E.D. N.Y. 2005).

Simply put, Turab Lookman has returned to life as a model citizen, caring and compassionate neighbor, husband and father.

> We try to get defendants, once they are released from custody…to live the type of life that [Turab] is living now. And that is, a life in which they are used to getting up in the morning to go to work, a life in which they are used to going home to their families…a life in which they take their children and their loved ones to a doctor, a life in which they are committed to their families…. ***We can't do any better than that.*** All we can do now is punish.

*United States v. Munoz-Nava*, 524 F.3d 1137, 1143 (10th Cir. 2008) (emphasis added). Any time spent incarcerated "can't do any better than that." *Id.* To the contrary, the progress Dr. Lookman has achieved "would be not only slowed, but utterly frustrated if [he] were incarcerated." *Griffiths*, 954 F.Supp. 738, 743 (D. Vt. 1997); *see also Hawkins*, 380 F.Supp.2d at 177 ("A sentence of incarceration would, both during and after the period of imprisonment, place the defendant in her former environment where, as she aptly observed, her associates were engaged in no productive activity and in substantial antisocial conduct").

3.     *Dr. Lookman's strong family support*

As all those around him recognize, Dr. Lookman is a devoted family man and the caring, understanding, and support he provided to his family over the years is now returned. As evidenced by the letters before the Court, Turab's family is just as committed to him as he is to them. They will provide whatever support is needed to help continue his journey to rebuild his life and ensure he exhibits the best of his character. This support is a sign of the general goodness of his character as well as a sign that he is unlikely to recidivate. *See Wachowiak*, 412 F.Supp. at 964 ("The strong family support [Turab] enjoy[s], which would aid in his rehabilitation and re-integration into the community.").

4.     *Low-end probated or financial sentence will provide deterrence through just punishment*

This Court should also recognize that just punishment and deterrence, both specific and general, will be accomplished with a low-end probated or financial sentence.

### a.   *Low risk of recidivism*

Federal sentencing law "unquestionably envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes." *Rodriguez*, 724 F.Supp. at 1120.  The United States Sentencing Commission has commissioned extensive studies showing that individuals like Turab Lookman are *immensely* less likely to re-offend. This is true for offenders of his age.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, p. 12, United States Sentencing Commission, May 2004, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.  It is true for individuals with his level of education. *Id.*  It is true for married individuals, *Id.*, and for those who do not use illicit drugs.  *Id.* at 13. It is true for individuals, like Dr. Lookman, who have shown a commitment to rehabilitation. *United States v. Perella*, 273 F.Supp.2d 162, 172 (D.Mass.2003).

### b.   *True first offender status significantly mitigates*

And it is especially true of *true* first offenders like Dr. Lookman.  *See Recidivism and the "First Offender"*, p. 16, United States Sentencing Commission, May 2004, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.  Through the Guidelines, criminal history is "a tool to measure offender culpability, to deter criminal conduct, and to protect the public from crimes of the defendant."  *See Measuring Recidivism*, p. 1. In this regard, Dr. Lookman's complete lack of criminal history is important.

Studies show the underlying point system used to determine the Criminal History Category under the Guidelines has significantly "greater prediction power" as to recidivism than the

Category itself. *Id.*, pp. 10 – 11, 15. True first offenders, those with zero criminal history points like Dr. Lookman, are significantly less likely to recidivate than any other individuals in the federal justice system, even other offenders that otherwise fall within the lowest Criminal History Category I. *Id.*, Ex. 4 (true first offenders 1/2 as likely to re-offend as others within Criminal History Category I); *see also United States v. Autery*, 555 F.3d 864, 874 (9th Cir.2009) (any argument that the Guidelines already account for a lack of criminal history "overlooks the fact that a defendant with a minor criminal history can still fall within Criminal History Level I…. because [defendant]'s Criminal History Level 1 did not fully account for his complete lack of criminal history, considering it as a mitigating factor not redundant or improper"); *United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass.2007) (demonstrable difference in recidivism rates of real first offenders compared to others within Criminal History Category I supported departure)..

Based on this empirical study, the Sentencing Commission itself suggested downward departures are appropriate in cases such as this by stating "sentencing reductions for 'first offenders' are supported by the recidivism data and would recognize their lower re-offending rates." *Measuring Recidivism*, p. 15. Specifically, a two-level reduction in offense level was contemplated. *Id.*

In this case, the low-end of the Guidelines is already minimal as the recommended sentencing range is 0 to 6. Taking into account that Dr. Lookman is a rare true first offender and the Sentencing Commission suggested a two level reduction – which, in this case, would make the offense level 2 – it is entirely appropriate to sentence Dr. Lookman at the low-end of the recommended sentencing range and provide for a probated or financial sentence.

In context, the Government's request of a sentence of 10 months is unreasonable. Initially, counsel notes that the recommended Guideline sentencing range would remain 0 to 6 even if the

offense level *doubled* to 8 rather than 4. The Government's request would require the Court to go even further, in direct contradiction to the recommendations of the Sentencing Commission in the *Measuring Recidivism* study. The experts recommend a two-level reduction, the Government asks for an increase of *two to three times in the offense level and an additional 66% increase in the <u>top of the Guideline sentencing range</u>.*

There is not a reasonable basis for such a request and to adopt the Government's approach would suggest an arbitrariness of justice that would undercut the goals of sentencing by formulating a disrespect for the law hindering a belief in justice and thus losing any deterrent effect. *See United States v. Lazenby*, 439 F.3d 928, 934 (8th Cir.2006). The Court should follow the Guidelines and the recommendations of the Sentencing Commission.

c.     *Just punishment from low-end probated or financial sentence*

It is important to remember that Turab has been and will continue to be punished significantly with a low-end probated or financial sentence. It took decades of hard work to build his dream at LANL, a dream that included opportunities to share his love of knowledge, science, and advancement with the next generation of scientists. His love of his work kept him from even considering retirement. As noted by Dr. Lookman himself, the loss of that status and connection has caused extreme anxiety that served as both punishment and weighty deterrence for both Dr. Lookman, and others in similar situations.

All Turab Lookman worked for, over decades and continents, is gone. His former title of "Fellow" has been replaced with the title of "felon." Dr. Lookman, a man who beamed with pride when he became a citizen of the United States, he will forever be a felon, which will affect every aspect of his life, down to every simple benefit he tries to obtain.

To Dr. Lookman and others in his position, a lesser penalty, including the time he already spent in custody and a probated or financial sentence as recommended by the Guidelines, will impress the seriousness of this matter and provide just punishment. *See United States v. Cull*, 446 F.Supp.2d 961, 965 (E.D.Wis.2006); *United States v. Hammond*, 240 F.Supp.2d 872, 880 (E.D.Wis.2003); *Germosen*, 473 F.Supp.2d at 230. The requested sentence, recommended by the Guidelines, will serve as just punishment and promote respect for the law, both in Dr. Lookman and others, who will understand they will be held accountable for similar transgressions, likely moreso without the lifetime of positive works from Dr. Lookman. *Id.*

d.      *Implications of pandemic on punishment*

At the same time, it must be acknowledged that Dr. Lookman has suffered extreme anxiety for months as a result of the growing danger of the COVID-19 pandemic in America. Dr. Lookman is a man of nearly 70 years. His age alone places him in a high-risk pool of serious complications and hospitalization. (According to the CDC, Dr. Lookman is four times more likely to have serious complications than an individual half his age). Furthermore, Dr. Lookman has a dangerous comorbidity of genetic cardiovascular disease. According to the CDC, this creates a risk of serious complications eight times higher and a risk of death twelve times higher. *See* Stokes E.K., Zambrano L.D., Anderson K.N., et al., *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May30, 2020.* MMWR Morb Mortal Wkly Rep 2020; 69:759-765, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w.

As this Court is aware, despite the best efforts of authorities, COVID outbreaks occur with frequency and deadly quickness in our detention centers and prisons. It is not possible in the context of a prison to maintain the safety, sanitation, and distancing required to protect oneself from potentially fatal infection. The reality is that if Dr. Lookman is imprisoned, there is an

unreasonable chance that such imprisonment would expose him to too high a risk of death. Dr. Lookman is aware of this, and he has spent months of vastly increased anxiety knowing that any sentence of imprisonment could mean he never returns home.

Counsel does not raise this to suggest that the pandemic somehow lessens Dr. Lookman's culpability. It is, however, a reality of our current situation that must be acknowledged and addressed. It necessarily increases the potential punishment, without intention and without relation to Dr. Lookman's blameworthiness or culpability, and is thus an appropriate consideration in support of a low-end probated or financial sentence. *See Koon v. United States*, 518 U.S. 81 (1996); *United States v. Graham*, 83 F.3d 1446, 1481 (C.A.D.C.1996); *United States v. Long*, 977 F.2d 1264 (8th Cir.1992); *United States v. Lara*, 905 F.2d 599 (2nd Cir.1990). In this climate, a low-end probated or financial sentence is just and appropriate.

## III. Conclusion

Dr. Turab Lookman's life spans almost seven decades and provides ample evidence of strength of character, goodness of spirit, generosity and caring that far surpasses the small window of this case. He has been, and is now, a man of high character and moral that has repeatedly shown a commitment to his family and his community. He has exhibited growth and rehabilitation during pretrial supervision "and society has regained a productive citizen." *Rodriguez*, 724 F.Supp. at 1119. His overall life is extraordinary for an individual appearing before the Court for sentencing.

In the unique circumstances of this case, keeping in mind the penultimate goal of sentencing, rehabilitation, it is apparent that:

> …society has nothing to fear from [Turab Lookman], as it seems most unlikely he will now throw away his rehabilitation…. The imposition of a jail sentence *would serve no end, but ritualistic punishment with a high potential for destruction*.

*Id.* (Emphasis added). As civilized people, our society refuses to participate in "ritualistic punishment." A low-end probated or financial sentence is appropriate.

WHEREFORE, for the above-stated reasons, the Defendant Turab Lookman respectfully requests this Court enter a probated or financial sentence as recommended by the Guidelines.

Respectfully submitted,

ROTHSTEIN DONATELLI, LLP

*/s/ Paul M. Linnenburger*

_____
PAUL M. LINNENBURGER
MARC M. LOWRY
500 4th Street, N.W., Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443 – office
(505) 242-7845 – fax
plinnenburger@rothsteinlaw.com
mlowry@rothsteinlaw.com
*Attorneys for Turab Lookman*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of August 2020, I filed this pleading electronically through the CM/ECF system which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jon Stanford
U.S. Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, NM  87103

Adam Duran
United States Pretrial Service
333 Lomas Blvd. NW
Albuquerque, NM  87102

*/s/ Paul M. Linnenburger*

_____
ROTHSTEIN DONATELLI, LLP